THE CITY OF MENDOTA, Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

Third District    No. 3—86—0549

Opinion filed October 1, 1987.

Michael S. Guilfoyle, of Mendota, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Gabriel M. Rodriguez, Assistant Attorney General, of Chicago, of counsel), for respondents.

JUSTICE WOMBACHER delivered the opinion of the court:

On December 10, 1985, the city of Mendota (city) filed a petition with the Pollution Control Board (Board) seeking a variance or exception from section 306.304 of the Pollution Control Board's rules, which prohibits overflows from sanitary sewers. (35 Ill. Adm. Code 306.304 (1985).) On July 11, 1986, the Pollution Control Board (Board) denied the variance/exception petition. On August 13, 1986, the city requested that the Board stay its decision or modify its order. The stay was denied by the Board on August 28, 1986. The city then filed the instant petition for direct review of the Board's decision pursuant to section 41 of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1985, ch. 111½, par. 1041).

The city owns and operates a sewage treatment plant and a separate sanitary sewer water system which discharges into Mendota Creek and the Little Vermilion River. The city holds a National Pollutant Discharge Elimination System (NPDES) permit which, within prescribed limits, allows for the discharge of contaminants from point sources into navigable waters. The city's NPDES permit imposes effluent limits of 10 mg/1 for biochemical oxygen demand (BOD) and 12 mg/1 for suspended solids (SS) on monthly averages. The treatment effluent from the system during 1985 was within permit limits, averaging 3 mg/1 for BOD and 5 mg/1 for SS.

During wet conditions, however, the city finds it necessary to allow excess flows to bypass the system, thereby allowing raw sewage to pass directly into Mendota Creek and the Little Vermilion River. The sanitary sewer system and waste water treatment plant were upgraded in 1977 in an attempt to reduce infiltration into the system and to eliminate occurrences of sewer bypassing. However, despite the rehabilitation project in 1977 at an approximate cost of $2 million, bypassing continues to occur at seven locations.

The city's plant is designed to provide complete treatment for a design maximum flow of 2.8 million gallons a day (mgd) and accommodates storage of another 1.5 mgd in the excess flow lagoon for later treatment when the excess flows can be returned to the head of the plant. This effluent represents flows receiving secondary and tertiary treatment estimated to be up to 1.8 mgd. Flows exceeding this amount are bypassed to the excess flow lagoons and discharged into Mendota Creek and the Little Vermilion River directly, without chlorination. The untreated effluent from the excess flow lagoons averages 20 mg/1 for BOD and SS, which exceeds the permit limits.

The city maintains that the engineering firm responsible for the 1977 project underestimated the volume of infiltration into the system. The engineers on the 1977 project had estimated that for a five-year storm the maximum inflow to the plant would be 5.8 mgd. At the hearing on the city's petition for a variance, G. Richard Spencer, the city's present engineer, stated that the engineers responsible for the 1977 project erroneously estimated the inflow into the system for a five-year storm. Spencer testified that for a five-year storm there would be 11,389 mgd delivered to the treatment plant. As a result, the city maintains that inadequate modifications were made to the system. Because of the erroneous estimates, the treatment plant is unable to meet the EPA regulations and guidelines. The city has filed suit against the engineering firm for damages because of the alleged design flaws. The city claims that any money it recovers as a result of the lawsuit will be used to help alleviate the bypass problems. The city contends that if it is not permitted to bypass, sewage backs up into the basements of approximately 75 residents, 8 to 10 times a year.

In June 1983, the Board granted the city a variance from section 306.304 of the Board's regulations, which forbids bypassing. The city's variance expired on September 10, 1984, and the city did not attempt to renew the earlier variance until December 10, 1985, when the city filed the petition for variance which forms the basis of the instant litigation.

In its current petition for variance, the city proposed several changes to its system that it has made or intends to make in the future. The city installed a recirculation line running from the east lagoon to the plant's tertiary treatment equipment in an attempt to accommodate higher volumes during wet conditions. The city also proposed to install a motorized gate valve, at a cost of $30,000, which would control flows into the plant during periods when an operator is not on duty. City witnesses testified that the city intends to correct

other problems of infiltration as they are found. The city's witnesses admitted, however, that these measures would not eliminate the need for bypassing. In order to eliminate the bypassing entirely, complete replacement of the sanitary sewer system would be necessary at an approximate cost of $14 million.

The city submitted data addressing the environmental impact of the bypassing. The data represented a sampling of the effluent discharged during bypassing events from May 1985 through March 1986. The sampling indicated that permit limits for SS and BOD were being exceeded at the bypass points, occasionally by as much as three times the regulated level. The city, however, did not submit flow data for the bypasses, Mendota Creek, or the Little Vermilion River. The plant operator testified that tests for contamination of Mendota Creek have never been performed after bypassing events. He admitted that no flow data had been compiled or submitted to the Board. The city's witnesses also admitted that no environmental impact study had been performed, although the city has contracted for a stream assimilation study/report to be performed.

The mayor of the city, James Troupis, testified that the city is experiencing economic difficulties and revenue shortfalls. The city presently has the fifth highest tax rate in La Salle County, yet ranks 34th among 37 communities in per capita income. The sewer rates charged by the city exceed the average of 36 Illinois communities. He testified that it would cost in excess of $14 million to correct the bypassing problems and sewer rates would have to be increased by 670%.

On July 11, 1986, the Board denied the city's petition for two reasons. First, the Board noted that the petition lacked flow data for the Mendota Creek, Little Vermilion River, and the bypasses which were necessary to determine the impact the bypassing was having on the environment. Secondly, the Board noted that the city had not proposed a plan which would eventually bring it into compliance with the Environmental Protection Act or with Board rules.

On appeal, the city raises several issues: (1) whether the decision of the Board was against the manifest weight of the evidence in that the Board did not find that the denial of a variance would cause an arbitrary or unreasonable hardship upon the city and its inhabitants; (2) whether the Pollution Control Board and the Environmental Protection Agency (EPA) should be equitably estopped from denying the variance because the EPA inspected and approved the 1977 rehabilitation plan of the city; (3) whether the Board's interpretation of 35 Ill. Adm. Code 104.121(f) (1985) is arbitrary and unreasonable; (4) whether the Board's decision is ambiguous and therefore denied the

city due process; (5) whether the Board erred in not permitting the city a reasonable period of time to complete its stream assimilation study; and (6) whether there was any basis for denying a stay from the Board's order because there was no immediate harm posed by the variance.

■ The city first argues that the Board's denial of its petition for a variance was against the manifest weight of the evidence because it met its burden of showing that compliance with the regulation would impose an arbitrary and unreasonable hardship on the city. The city claims that the only alternative it has at this time, other than the variance, is to plug the bypasses, which causes sewage to back up into 75 homes and creates a serious health risk to the inhabitants of the city. The Board argues that the city did not meet its burden of proof because it did not show that the individual hardship it suffers from compliance with section 306.304 outweighs the environmental harm created by the proposed variance.

Section 35 of the Environmental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1035) provides that the Board may grant a variance when "compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary hardship." Section 37 of the Act places the burden of proof on the person seeking a variance and requires the Agency to investigate the petitions filed, to consider the views of persons who would be adversely affected by the grant of a variance, and to recommend a disposition of the petition. (Ill. Rev. Stat. 1985, ch. 111½, par. 1037.) In granting or denying a variance the Board must balance individual hardship against environmental impact. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684.) To this end the Board requires that one who seeks a variance provide:

"An assessment, with supporting factual information, of the environmental impact that the variance will impose on human, plant, and animal life in the affected area, including, where applicable, data describing the existing air and water quality which the discharge may affect ***." 35 Ill. Adm. Code 104.121(g) (1985).

The city did submit evidence relating to the composition of the effluent during bypassing events. That evidence showed that the levels of SS and BOD were two to three times the permitted levels for effluent discharges at those point sources. Although the city's plant operator thought those were acceptable levels, there was no evidence submitted to support his conclusion. In addition, the plant operator and city engineer admitted that a stream assimilation study was required

to determine the environmental effect bypassing was having on Mendota Creek and the Little Vermilion River. The city also admitted that it presented no flow data for the bypasses, the creek or the river.

■ The Board stated in its order that it could not determine the environmental impact without the flow data. Although the city presented evidence of the hardship it suffered as a result of the no-bypass rule, it failed to present evidence regarding the impact granting of the variance would have on the environment. Without this evidence the Board could not find that section 306.304 worked an arbitrary or unreasonable hardship on the city. We find that the record supports the Board's conclusion that the petitioner failed to meet its burden of showing an arbitrary or unreasonable hardship because the city failed to provide the necessary environmental data.

■ The city next argues that the Board and the EPA should be equitably estopped from denying the variance because they inspected and approved the 1977 rehabilitation plan for the city's treatment plant. The city contends that it submitted its design plans to the EPA and, after they were approved, a permit was issued. The city contends that it spent approximately $2 million of its own funds and those of a grant from the EPA in reliance upon the assurances of the Board and the EPA that its plant rehabilitation project in 1977 would bring it into full compliance with pollution control standards.

Whether the doctrine of equitable estoppel may be applied against a municipal corporation in a given case depends on the totality of the circumstances. (*Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 289 N.E.2d 484.) Six elements must be shown in order for the doctrine of equitable estoppel to apply: "(1) words or conduct by the party against whom the estoppel is alleged constituting either a misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom the estoppel is alleged that representations made were untrue; (3) the party claiming the benefit of an estoppel must not have known the representations to be false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting the estoppel; (5) the party seeking the benefit of the estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of the estoppel must be in a position of prejudice if the party against whom the estoppel is alleged is permitted to deny the truth of the representations made." *Stewart v. O'Bryan* (1977), 50 Ill. App. 3d 108, 110, 365 N.E.2d 1019, 1020-21.

In the instant case, the EPA never represented to the city that it

would be assured a variance or that it could operate its water treatment plant in a manner inconsistent with the no-bypass regulation. Although the EPA did issue the city an NPDES permit based upon its review of the city's sewer system rehabilitation plan designs, we do not think this amounted to a misrepresentation or a concealment of material facts upon which the city relied. We do not believe that approval of the NPDES permit or the rehabilitation plan constituted a guarantee that the city would be entitled to a variance should its system prove inadequate in the future.

■■ The city suggests that the design of the system, which was reviewed by the EPA, is responsible for the bypass problems. However, the city's engineer, G. Richard Spencer, acknowledged at the hearing that the bypassing problems were not the result of a faulty design, but instead, arose from inaccurate estimates regarding the size of the sewage treatment and transport facilities. He testified that the engineering firm which drew up the plans grossly underestimated infiltration and flow into the system. Therefore, if a misrepresentation was made, it is clear that it was not made by the EPA or the Board. Thus, we find that the doctrine of equitable estoppel is not applicable here because the city had failed to show that the EPA or the Board made material misrepresentations or that they concealed material facts.

■■ The city next argues that the Board's interpretation of 35 Ill. Adm. Code 104.121(f), which requires a petitioner to propose an eventual plan for compliance when seeking a variance, is arbitrary and unreasonable. The city contends that the Board should not have denied the variance/exception where the Board has failed to adopt procedural rules governing site-specific exemptions. The city contends that the Board's interpretation is arbitrary and unreasonable on its face because it does not offer a procedural avenue, other than the variance procedure, when full compliance with the Board's regulations is impossible. The city argues that full compliance is impossible in this case and the harm to the city clearly outweighs the environmental impact on the Mendota Creek and the Little Vermilion River.

Section 11(b) of the Act articulates the purpose of the Act with respect to water pollution:

"It is the purpose of this Title to restore, maintain and enhance the purity of the waters of the State in order to protect health, welfare, property, and the quality of life, and to assure that no contaminants are discharged into the waters of the State *** without being given the degree of treatment or control necessary to prevent pollution, or without being made sub-

ject to such conditions as are required to achieve and maintain compliance with State and federal law ***." Ill. Rev. Stat. 1985, ch. 111½, par. 1011(b).

Section 35 of the Act empowers the Board to grant variances. (Ill. Rev. Stat. 1985, ch. 111½, par. 1035.) The Illinois Supreme Court has stated that "[c]ompliance by all polluters with [B]oard regulations is an ultimate goal ***. The Act's emphasis on public health indicates that this objective is to be sought regardless of the hardship which the task of eventual compliance presents an individual polluter." (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 287, 367 N.E.2d 684, 688.) The proper standard of review to be applied to regulations promulgated by the Board is whether they are clearly arbitrary, unreasonable, or capricious. *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 319 N.E.2d 782.

●6, 7 The variance provisions of the Act are intended to afford some flexibility in regulating the speed of compliance. The provisions are not intended, however, to allow for open-ended variances because this would be inconsistent with the Act's objectives. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684, 688.) Section 104.121(f) requires a petition for variance to include:

"A detailed description of the existing and proposed method of control to be undertaken to achieve full compliance with the Act and regulations, including a time schedule for the implementation of all phases of the control program from initiation of design to program completion and the estimated costs involved for each phase and the total cost to achieve compliance ***." (35 Ill. Adm. Code 104.121(f) (1985).)

This section of the Board's procedural regulations simply requires a petitioner to include a proposed compliance plan with the petition for variance. Given the legislative purpose behind the Act, we find that this requirement is neither arbitrary nor unreasonable.

The city also argues that the Board's interpretation of section 104.121(f) and subsequent denial of the variance/petition was arbitrary and unreasonable because the Board failed to adopt procedural rules governing site-specific rules and exemptions. This argument is misplaced, however, because the Act does not require the Board to establish procedures for obtaining site-specific relief. The Board is a creature of the legislature and can only act pursuant to the powers conferred on it by the General Assembly. (*Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 387 N.E.2d 258.) In addition, a party who desires a permanent site-specific exemption may seek

amendment of a substantive regulation under sections 27 and 28 of the Act. Ill. Rev. Stat. 1985, ch. 111½, pars. 1027, 1028.

The city's fourth argument is that the Board's written decision is ambiguous and therefore denies the city of Mendota due process. The city argues that the Board's decision is ambiguous because in its written order, the Board recommended certain possible courses of action the city might pursue in an attempt to achieve compliance even though the city claims it has already demonstrated that compliance with the regulations would be impossible.

Section 35(a) of the Act provides that "[i]n granting or denying a variance the Board shall file and publish a written opinion stating the facts and reasons leading to its decision." (Ill. Rev. Stat. 1985, ch. 111½, par. 1035(a).) A review of the Board's decision reveals that the Board clearly set out the relevant facts addressed at the hearing and the critical facts supporting the two reasons upon which it found the city's petition deficient. We find the recommendations that the Board made in its written decision to be merely gratuitous and are not grounds for reversal.

The city's final argument is that the Board erred in not permitting the city a reasonable period of time to complete its stream assimilation study. The city also argues that the Board abused its discretion in denying the city a stay pending the city's appeal or a petition for a site-specific exemption being filed. The city contends that it was and is attempting to comply with the regulations and in doing so has contracted to do a stream assimilation study. The city claims that through testimony and exhibits it demonstrated that no immediate harm was being caused by its bypassing and that a denial of the variance would cause a substantial hardship on the city and its residents. The Board argues that it did not act unreasonably in denying the city additional time to complete the stream assimilation study because the city had ample time to complete its environmental studies before it filed its petition. The Board claims that the city made no effort to extend or renew its original variance which expired on September 30, 1984, until December of 1985. We agree with the Board's contentions.

However, we believe that the city has made a "good faith" attempt at complying with the Board's regulations. In 1977 the city spent approximately $2 million to improve its sanitary system in an attempt to comply with the pollution rules. The city also has proposed numerous changes that it has made or intends to make in the future to improve its sanitary system and achieve full compliance. If the city chooses to repetition the Board for a variance, it should include in its petition for a variance a plan for eventual compliance with the EPA

pollution guidelines because the variance procedure is not intended as a mechanism for seeking permanent exemption from the Act.

Accordingly, the order of the Illinois Pollution Control Board dated July 11, 1986, is hereby affirmed.

Affirmed.

STOUDER and HEIPLE, JJ., concur.