EKCO GLACO CORPORATION, Petitioner-Appellant, v. THE ENVIRON-
MENTAL PROTECTION AGENCY *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—88—0803

Opinion filed July 12, 1989.

Gardner, Carton & Douglas, of Chicago (Mary Beth Cyze, Jeffrey C. Fort and James J. DeNapoli, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Michelle D. Jordan, Matthew J. Dunn, and Gerald T. Karr, Assistant Attorneys General, of Chicago, of counsel), for respondents.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Petitioner, Ekco Glaco Corporation (Ekco Glaco), appeals from an order of the Illinois Pollution Control Board (Board) which denied its request for an extension of a previously granted variance from certain Board air pollution control regulations relating to petitioner's commercial bakery pan coating operations. The Board also denied petitioner's motion for rehearing. Ekco Glaco filed a petition, in this court, for direct review of the Board's decision pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1041). Ekco Glaco contends that the following Board findings are contrary to the manifest weight of the evidence: (1) immediate compliance with the Board's regulations would not impose an arbitrary and unreasonable hardship upon Ekco Glaco; and (2) Ekco Glaco did not

have a firm compliance plan and was not committed to achieving compliance.

For the reasons stated below, we affirm the order entered by the Pollution Control Board.

The record indicates that Ekco Glaco manufactures and reconditions commercial bakery pans at a plant located at 1949 North Cicero Avenue in Chicago. The plant employs approximately 300 to 350 people and has an annual payroll of $5.4 million. Annual production of new pans is approximately 1.2 million pans, which comprises approximately 50% of the domestic commercial bakery pan market. Ekco Glaco also exports new bakery pans. Ekco Glaco reconditions approximately 440,000 used bakery pans annually for approximately 35 commercial bakeries located within a 150-mile radius of Chicago. Ekco Glaco's used pan facility is the only such facility in the area. Used pan reconditioning involves the removal of heavy carbon and grease buildup and subsequent application of a silicone coating. The coating facilitates easy release of bakery products from the pans. Reconditioning can be completed in as few as 24 hours. Sales for the used pan reconditioning operation were $714,000 for 1986. Seventy-five percent of the new pans are coated at the plant, in addition to all of the used pans. The coating process involves the use of solvents which contain volatile organic material (VOM), as defined under 35 Ill. Adm. Code §211.122 (1985). VOM emissions are generated during the coating process and are vented through a stack to the atmosphere.

Board regulations required manufacturing plants to comply by December 31, 1983, with certain limitations on VOM emissions. (35 Ill. Adm. Code §215.211(a)(1) (1985).) Further, a compliance plan was required to be submitted to the Illinois Environmental Protection Agency (Agency) by August 19, 1983. (35 Ill. Adm. Code §215.212(a) (1985).) Section 215.204(j)(1) of the Board regulations provides a limitation of 4.3 pounds per gallon of VOM emission for a plant such as petitioner's. (35 Ill. Adm. Code §215.204(j)(1) (1985).) Alternatively, the plant may utilize one of the following systems in order to comply with Board regulations: (1) an afterburner system, provided that 75% of the emissions from the coating line and 90% of the nonmethane VOM which enter the afterburner are oxidized to carbon dioxide and water; or (2) a system shown to have a control efficiency equivalent to or greater than that provided under section 215.204. 35 Ill. Adm. Code §215.204 (1985).

In March 1983, the Agency initially notified Ekco Glaco's corporate predecessor, Ekco Products, Inc., that it would be required to comply with relevant VOM limits. Since the original notification, the

company has changed from Ekco Products, Inc., to Glaco Corporation to Ekco Glaco Corporation. The corporation initially argued that the Board regulations do not apply to its operations. The company then agreed that the rule limiting emissions does apply to its operations. The company hired consultants, prepared reports, and evaluated alternatives. In March 1985, the company filed its first petition for a variance and decided to install a thermal afterburner system on the bakery pan coating lines. The petition asserted that the company would achieve compliance with section 215.204(j)(1) within one year through a two-phase compliance program. In the first six months, the company would modify the existing process equipment and exhaust systems to provide for adequate capture of VOM emissions for incineration in thermal afterburners. Then the company would conduct a stack test. After the stack test, the second six-month phase, involving actual construction of the afterburners, would begin. The company estimated the total cost of the compliance program to be $250,000. In April 1985, the Agency recommended to the Board that the petition be granted, subject to certain conditions. After a hearing, the board granted a variance from sections 215.204(j)(1) and 215.205 from June 27, 1985, to June 27, 1986.

On June 23, 1986, Ekco Glaco filed a petition to extend the variance for its new pan operation. In its petition, Ekco Glaco asserted that effectuation of its compliance plan was delayed when two of the three contractors who received bid packages for the first phase of the project refused to bid. The third contractor would bid on only a portion of the project. Ekco Glaco then instructed its consultant to attempt to eliminate spray leakage from the spraying machine, one of the major tasks of the first phase of the proposal. In December 1985, after three months, the consultant determined that a total redesign of the machines was necessary, but that redesigning could not be accomplished within the variance compliance schedule. Ekco Glaco rejected a proposal to relocate the new pan spray machine. Two new consultants, SAIC and Richmond Tech-Air (Richmond), evaluated Ekco Glaco's operations. Richmond visited Ekco Glaco's plant, measured the exhaust air flow for solvent concentration, and on June 30, 1986, submitted its report to Ekco Glaco.

Ekco Glaco did not propose modifications for its used pan line in its extension petition, since the company decided to take the used pan line out of operation and relocate it by June 1987. In its recommendation, the Agency urged the Board to grant the variance extension, but only until January 1, 1987. The Agency reasoned that if the VOM control equipment on the new pan line could reduce overall VOM emis-

sions by 75%, then plantwide compliance would be made under the Board's internal offset rule. (35 Ill. Adm. Code §215.207 (1985).) This rule allows a facility to achieve compliance by overcontrolling emissions from one source while excess emissions are produced from another source. On November 20, 1986, the Board granted Ekco Glaco a variance extension to January 1, 1987.

On December 19, 1986, Ekco Glaco filed a petition for rehearing of the Board's November 20, 1986, ruling, and requested that the variance extension be given until February 15, 1987. Ekco Glaco asserted that unforeseen events, including delays in finalizing the purchase of the afterburner unit, precluded the company from complying with the January 1, 1987, deadline. On January 8, 1987, the Board granted Ekco Glaco's request to extend the variance to February 15, 1987.

On February 10, 1987, hydrocarbon testing was performed on the new pan line with the new afterburner system. The test results, compiled in a report of the Almega Corporation dated March 19, 1987, showed that the new control system was not capable of 75% overall VOM emission reduction as required by section 215.205. On April 1, 1987, Ekco Glaco filed another petition for variance extension, seeking until November 1, 1987, to allow it to repair the afterburner and achieve compliance. Ekco Glaco also requested that the variance granted in the original proceeding for the used pan line be extended to April 1, 1988, since the company was unable to achieve compliance regarding the used pan line under the internal offset rule until that time.

At a hearing on August 7, 1987, Wayne Beasley, Ekco Glaco's manager of manufacturing services, testified that the company's compliance efforts were directed toward improving the destruction efficiency of the afterburner on the new pan line. The company believed that increasing the destruction efficiency of the afterburner would allow for compliance of the new pan line. Ekco Glaco did not provide a timetable for afterburner improvements, but asserted that compliance would be shown by November 1, 1987. If the contemplated repairs and modifications to the existing afterburner on the new pan line were not successful, the company's board of directors would then determine what steps should be taken. Beasley admitted that Ekco Glaco had experienced difficulties with the afterburner since 1986. Beasley stated that Ekco Glaco had no reason to believe that the repairs and modifications would not work.

Regarding used pan reglazing operations, Beasley stated that compliance efforts might include shutting down the new pan line, rescheduling production, relocating the used pan, or installing VOM con-

trol equipment on the used pan line. Beasley stated, however, that Ekco Glaco did not know why any of these compliance efforts would be completed. Further, calculations were not complete regarding whether the reduction in emissions resulting from operation of the afterburner would offset emissions from the used pan line.

David Powell, regional vice-president of Ekco Glaco, also testified and explained the glazing process operations. In addition, Powell stated that local bakeries benefit from the used pan reglazing facility, particularly from the convenient location and the short turn-around time the company provides for reglazing used pans. Shutting down the plant would result in increased costs for bakeries to obtain reglazing services from other companies and would affect customer prices.

Over Ekco Glaco's objection, the Board admitted two documents submitted by the Agency which set forth results of 1987 air quality monitoring tests for ozone in Illinois. The Agency asserted that the documents were official Agency documents of which the Board could take official notice under section 103.204(a) of the Board regulations. That section provides that evidence is admissible "which is material, relevant and would be relied upon by reasonably prudent persons in the conduct of serious affairs." (35 Ill. Adm. Code §103.204(a) (1985).) The Board admitted the documents for the "sole purpose" of showing that "during 1987 the ambient air quality standard for ozone has been violated frequently, pervasively, and substantially in Northeastern Illinois."

After the hearing, both parties submitted briefs and the Board then issued its order denying the petition for a further extension of the variance. The Board found that Ekco Glaco's inability to achieve compliance arose from "the delay caused by decisions it has made in attempting to secure compliance and its failure to commit to a particular compliance option. The Board cannot find that those problems constitute an arbitrary or unreasonable hardship, especially when the potential for environmental harm and lack of a firm compliance plan are considered." In addition, the Board stated that although Ekco Glaco asserted that its VOM emissions would not cause a significant adverse impact upon air quality, the number of hydrocarbon sources in northern Illinois that contribute to the ozone problem is large. The Board concluded that Ekco Glaco is a source of hydrocarbons which, "to an unquantified degree," contributes to the violations of ambient air quality standards for ozone in northern Illinois.

The Board also found that Ekco Glaco lacked a firm compliance plan. With regard to the new pan line, Ekco Glaco showed no alternative plan if repairs and modifications to the afterburner were not suc-

cessful. The compliance plan for the used pan line was "even more uncertain," and might include the use of emission offsets, relocating the used pan line, or adding on additional controls. Further, Ekco Glaco could not provide a schedule by which the proposals for the used pan line would be implemented. In summary, the Board stated that Ekco Glaco lacked diligence in pursuing compliance. The Board found that any hardship in complying with the 1983 regulations was "largely self-imposed, in that it results from prior business decisions." The Board noted the four-year delay in Ekco Glaco's compliance with the regulations.

■ Initially, on appeal, Ekco Glaco contends that the Board's finding that immediate compliance with Board regulations would not impose an arbitrary and unreasonable hardship upon Ekco Glaco is contrary to the manifest weight of the evidence. Section 35(a) of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1035(a)) provides that, "[t]o the extent consistent with applicable provisions of the *** Clean Air Act," the Board may grant individual variances where it is shown that "compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship." The petitioner has the burden of proving arbitrary and unreasonable hardship. (Ill. Rev. Stat. 1987, ch. 111½, par. 1037; see *Philipsborn Equities, Inc. v. Pollution Control Board* (1981), 94 Ill. App. 3d 1055, 419 N.E.2d 470.) The Agency is required to investigate the petition, consider the views of persons who would be adversely affected by the grant of a variance, and recommend a disposition of the petition. (Ill. Rev. Stat. 1987, ch. 111½, par. 1037; see *City of Mendota v. Pollution Control Board* (1987), 161 Ill. App. 3d 203, 514 N.E.2d 218.) Ekco Glaco also cites section 36(b) of the Environmental Protection Act for the proposition that an extension may be granted where "satisfactory progress" toward compliance is shown. Ill. Rev. Stat. 1987, ch. 111½, par. 1036(b).

■ ■ The Board's findings on questions of fact are considered *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110; *Philipsborn Equities, Inc.*, 94 Ill. App. 3d at 1057.) On appeal, this court is limited to a determination of whether there is sufficient evidence to support the Board's decision, and that decision may not be reversed unless contrary to the manifest weight of the evidence. (*Philipsborn Equities, Inc.*, 94 Ill. App. 3d at 1057.) A decision is against the manifest weight of the evidence only if opposite conclusions are "clearly evident." (*Ballin Drugs, Inc. v. Department of Registration & Education* (1988), 166 Ill. App. 3d 520, 530, 519 N.E.2d 1151.) That a court of review might find an opposite conclusion rea-

sonable is not sufficient to overturn a Board decision. *Philipsborn Equities, Inc.*, 94 Ill. App. 3d at 1057.

Ekco Glaco asserts that denial of the extension petition would lead to a shutdown of its new pan and used pan facilities, which would adversely impact Ekco Glaco and its local customers, who rely on Ekco Glaco's quality glazing product and short turn-around time. Ekco Glaco also asserts that its VOM emissions would not cause an adverse impact upon air quality. Ekco Glaco notes that in its opinion granting the original variance relief, the Board found that Ekco Glaco contributed less than .02% of Cook County's total VOM levels, and that such contribution to VOM emissions was minor and would cause minimal environmental impact. Ekco Glaco also asserts that between 1984 and 1986, the ozone monitor closest to Ekco Glaco's plant did not record any "exceedances." Ekco Glaco asserts that ozone violations recorded in the two Agency documents often occurred on weekends, when Ekco Glaco's plant was not in operation. Further, the Agency's report concluded that it is not possible to distinguish adequately an individual VOM source impact on the regional air quality.

■■ ■ In granting or denying a petition for a variance, the Board must balance individual hardship against environmental impact. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684; *City of Mendota v. Pollution Control Board* (1987), 161 Ill. App. 3d 203, 514 N.E.2d 218.) The Board concluded that any individual hardship upon Ekco Glaco was outweighed by the environmental impact, which had occurred over several years of noncompliance by Ekco Glaco. The Agency stated that it was not possible to measure with accuracy the impact of any single emissions source on the environment. However, the Board found that Ekco Glaco was a source of hydrocarbon emissions into the air, and as such, contributed to violations of the ambient air standards. This evidence supports the Board's decision. Further, in view of the other considerations made by the Board, particularly regarding the delays resulting from the decisions made by Ekco Glaco and the company's continued failure to achieve compliance, we cannot find that the Board's conclusion was contrary to the weight of the evidence.

Ekco Glaco asserts that the two Agency documents were improperly admitted and considered by the Board. Ekco Glaco asserts that one document is a computer printout listing "exceedances" on certain dates in the Chicago area. The second document is an internal memorandum of the Agency recording certain ozone "exceedances." Ekco Glaco contends that the Agency documents are unauthenticated, since they are not original documents, do not contain an official seal, and

no witnesses were called to verify their authenticity. Ekco Glaco cites the Seventh Circuit case of *Powers v. Dole* (7th Cir. 1986), 782 F.2d 689, for the proposition that a court cannot take judicial notice of an unauthenticated government record.

■ Section 12(c) of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1987, ch. 127, par. 1012(c)) provides that in a proceeding before an administrative agency:

> "Notice may be taken of matters of which the Circuit Courts of this State may take judicial notice. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge." (Ill. Rev. Stat. 1987, ch. 127, par. 1012(c).)

(See also Ill. Rev. Stat. 1987, ch. 127, par. 1003.01.) We find that the statute allows for the Board to take official notice of the documents submitted by the Agency, since the documents contain "generally recognized technical or scientific facts within the agency's specialized knowledge." Further, the Act permits an administrative agency to take official notice of facts which are properly disclosed and put upon the record, and where the other party has an opportunity to be heard regarding the propriety of taking notice of the facts. (*Caterpillar Tractor Co. v. Illinois Pollution Control Board* (1977), 48 Ill. App. 3d 655, 363 N.E.2d 419.) In the instant case, Ekco Glaco had an opportunity to rebut the facts contained in the documents submitted by the Agency. Ekco Glaco never contested the truth of the information contained in the documents. Further, the Board admitted the documents for the sole purpose of showing violations generally of ambient air quality standards in northeastern Illinois. Since we have found that the documents were properly admitted pursuant to the Administrative Procedure Act, we need not address Ekco Glaco's further assertion that a proper foundation was not laid to admit the documents as business records.

Ekco Glaco also contends that the record fails to show that its hardship was self-imposed, and that, in any event, the question of whether a hardship is self-imposed is only one of many relevant factors in determining whether a variance should be granted. The record indicates, however, that the Board considered the required factors (see 35 Ill. Adm. Code §104.121 (1985)), including a description of the petitioner's business operations, materials used and discharged, areas affected by the operations, and Ekco Glaco's proposed methods of control in order to achieve compliance with regulations.

Further, Ekco Glaco asserts that the Board failed to criticize the compliance plan or individual decisions made by Ekco Glaco, but

rather was critical of noncompliance within a certain time that the Board believed was acceptable. Ekco Glaco asserts that decisions to achieve compliance generally are "business decisions," in that they involve the expenditure of corporate assets and directly impact the operation of the corporation. Ekco Glaco asserts that the legislature did not intend to give the Board authority to establish such broad policies, to allow the Board to deny variance relief where there have been "unforeseen circumstances" which cause delays in compliance.

■ We find, however, that the record supports the conclusion that Ekco Glaco failed to show "satisfactory progress" (Ill. Rev. Stat. 1987, ch. 111½, par. 1036(b)) toward achieving compliance. Ekco Glaco failed to allow for delays or to make alternative proposals when it determined to purchase a used afterburner for the new pan line and bring its used pan line into compliance by use of the internal offset rule. Between 1985 and 1987, the Board already had granted Ekco Glaco an original variance, and two extensions of the original variance, in order to allow the company to achieve compliance with the 1983 regulations. Even after the second extension, to bring the compliance date to February 15, 1987, Ekco Glaco still did not approach compliance with the Board requirements. We do not believe that the Board overextended its authority or that its decision is contrary to the weight of the evidence.

■ Ekco Glaco also contends that the Board's finding that the company lacked a firm compliance plan is contrary to the manifest weight of the evidence. Ekco Glaco provided the Board with as much detailed information as possible regarding its compliance plan, and the record fails to show that the compliance plan will not be successful. Further, given the short time period of the requested variance and the time at which the hearing was conducted, Ekco Glaco could not provide the Board with a detailed schedule of compliance dates. Ekco Glaco also asserts that it acted prudently in hiring consultants and formulating a compliance plan, and that its efforts to achieve compliance were substantial and in good faith.

Ekco Glaco's Wayne Beasley testified, however, that the company had problems with the afterburner since 1986, and could not provide a date by which the afterburner improvements for the new pan line would be completed. Further, while the company was considering a number of alternative plans for bringing the used pan operations into compliance, it could not give any dates by which such changes could be made. We find that the record supports the Board's conclusion that Ekco Glaco lacked a definite compliance plan for its new and used pan operations.

We hold the Board's decision to deny Ekco Glaco an extension of the previously granted variance was not contrary to the manifest weight of the evidence.

For the foregoing reasons, the order of the Pollution Control Board is affirmed.

Order affirmed.

RIZZI and CERDA, JJ., concur.