**Louise DURFEE, in her capacity as Director of the Rhode Island Department of Environmental Management,**

v.

**OCEAN STATE STEEL, INC.**

**No. 93–507–Appeal.**

Supreme Court of Rhode Island.

Jan. 26, 1994.

Claude Cote, Dept. of Environmental Management, Mark Wallace Siegars, Dept. of Environmental Management, for plaintiff.

Dennis Esposito, W. James McKay, David Wollin, Ocean State Steel, Thomas V. Moses, RI Dept. of Economic Development, Providence, for defendant.

Deming E. Sherman, Blackstone Park Improvement Ass'n., Ralph J. Perrotta, East Providence Coalition/C Care of RI, Providence, William C. Maaia, East Providence School Committee, East Providence, amicus curiae.

## OPINION

MURRAY, Justice.

This case comes before us on the appeal of the defendant, Ocean State Steel, Inc. (Ocean State), an East Providence-based steel-manufacturing plant, from a Superior Court order finding it in contempt of a prior court order entered into by consent of both Ocean State and the Rhode Island Department of Environmental Management (DEM).

The facts that give rise to this dispute involve a consent agreement signed by the parties. The factors that led to the drafting

of that agreement are as follows: In December 1989 DEM notified Ocean State of its air-pollution violations. In January 1990 Ocean State submitted a plan to DEM that called for a program to remediate emissions, including the installation of certain air-pollution-control equipment. In April 1990 Ocean State notified DEM that the air-pollution-control equipment would be installed and operational by June 1990. During May 1990 Ocean State informed DEM that it was unlikely that the air-pollution-control equipment would be operational until July 1990. Subsequently DEM issued a notice of violation to Ocean State, ordering it to achieve compliance with certain state pollution-control regulations by installing and making operational the air-pollution-control equipment by June 30, 1990.

In July 1990 DEM and Ocean State executed an administrative consent agreement in which Ocean State agreed to comply with specific state pollution-control regulations by having the air-pollution-control equipment operational by July 31, 1990. The agreement stated in pertinent part that

"[i]f the air pollution control equipment is not operational by 31 July 1990 Ocean State *shall cease operations* that contribute to violations of Regulations 1, 3, and 7 until the air pollution control equipment is operational *and in compliance with said regulations.*" (Emphasis added.)

In November 1990 DEM filed a complaint and request for injunctive relief against Ocean State to enforce the terms of the consent agreement. The complaint asserted that Ocean State had failed to install numerous pollution-control devices and had been emitting air contaminants from its East Providence location since November 1989. The DEM contended that these emissions violated the Rhode Island Clean Air Act, G.L.1956 (1989 Reenactment) chapter 23 of title 23, and the Rhode Island Department of Environmental Management Division of Air and Hazardous Materials Air Pollution Con-

trol Regulations 1, 3, and 7 (regulations) promulgated pursuant to the Rhode Island Clean Air Act.[1]

The consent agreement was amended and adopted by the court in December 1990. That order provided in part that "[n]othing in this order [absent certain modifications of air-pollution-control equipment installation dates] shall alter and change the rights, duties and obligations of the parties arising under the administrative [c]onsent [a]greement." The order was further amended in July 1991 and January 1992. The final amended order, entered on January 7, 1992, provided that the two previous orders entered by the Superior Court on December 6, 1990, and July 22, 1991, "remain in full force and effect."

The final order also required (1) that DEM issue an air-pollution-control permit (permit) to Ocean State, (2) that Ocean State install all pollution-control equipment by August 15, 1992, (3) that if Ocean State failed to comply with the regulations or the terms of the permit, it was required to implement additional measures as outlined in an attached exhibit and submit a proposed schedule for the implementation of those measures, and (4) that Ocean State install an air-pollution monitoring station and allow DEM access to the station. An approval letter from DEM was attached to the order along with a list of permit conditions and emission limitations. These air-pollution-control permit conditions and limitations were separated into five distinct categories: (1) operating conditions and emission limitations (establishing opacity, production, particle emission, and gas-temperature limitations), (2) monitoring requirements (establishing monitoring requirements for specific air-pollution-control equipment), (3) record keeping and reporting (directing Ocean State to forward at least three different types of monthly air-pollution monitoring reports to DEM), (4) stack testing (directing Ocean State to stack-test with the appropriate notification, approval, and observation of

1. Regulation 1 regulates opacity, which is the degree to which air contaminants reduce the transmission of light and obscure a contrasting background. Regulation 3 governs the total particulate emissions allowable on an hourly basis. Regulation 7 is a general provision controlling

different types of air emissions if such emissions are injurious to human, plant, or animal life or if the emissions become a nuisance. *See* Rhode Island Department of Environmental Management Division of Air and Hazardous Materials Air Pollution Control Regulations 1, 3, and 7.

the stack-testing procedure by DEM), and (5) other requirements (outlining specific guidelines for the implementation and the operation of other miscellaneous pollution-control equipment). Our review of this addendum shows that Ocean State incurred very clear and specific responsibilities.

Ocean State did not comply with the final amended order, and in June 1993 DEM filed a petition to adjudge Ocean State in contempt. The DEM alleged that Ocean State had failed to comply with the final amended order, the regulations, and the terms of the permit. The DEM sought (1) a temporary injunction ordering a cessation of all steel production, (2) immediate compliance by Ocean State with the consent order, the Rhode Island Clean Air Act, and the regulations, and (3) miscellaneous fines and attorney's fees.

At the outset we note that our review is limited to what occurred during the contempt hearing and therefore we do not specifically review any prior proceeding. The testimony at the July 1993 contempt hearing revealed the following: Terry Tuchon, an employee in the Division of Air Resources of DEM, testified that Ocean State was in violation of the opacity limitations as set forth in the permit, approximately sixty times from January to April 1993. Douglas McVay (McVay), a supervising engineer for DEM, testified that Ocean State had not performed the mandated "stake testing" as required by the permit.[2] McVay further testified that Ocean State had also failed to complete other pollution-monitoring activities and failed to submit timely reports to DEM as required by the permit.

McVay stated that the steel production process generates approximately thirty-nine pounds of steel dust for every ton of steel that is produced. In the air-pollution-control permit, Ocean State represented that its equipment would capture approximately thirty-eight pounds of the steel dust produced. In actuality, however, the equipment was collecting only twenty pounds of steel dust per ton of steel produced. The unfiltered remainder was being released into the atmosphere. McVay calculated that approximately 600,000 tons of steel dust had been emitted

into the atmosphere between August and December 1992.

Ferguson Porter (Porter), president of Ocean State, testified that Ocean State expended $900,000 on emission-caption equipment. He admitted that he was disappointed with the filtering and performance capabilities of the emission-caption equipment. Porter stated that without any prompting from DEM, Ocean State attempted modifications to increase the capabilities of the emission-caption equipment. Porter testified that Ocean State chose not to perform the required stake testing because Ocean State realized that it would have failed.

Porter admitted that during a June 1993 meeting with DEM, the purpose of which was to bring Ocean State into compliance with the consent order, alternatives to ceasing operations were discussed. The DEM had suggested the possibility of allowing Ocean State to operate using one furnace instead of the usual two furnaces that Ocean State utilized in the steel-production process. A discussion also ensued regarding the possibility of Ocean State's paying significant monetary fines in lieu of ceasing operations.

The trial justice found that although Ocean State had expended a significant amount of money trying to meet the requirements of the consent order, those efforts fell "far short" of what was expected by DEM. The trial justice noted that Ocean State failed to self-monitor its pollution-control activity. He stated that the court could "reasonably infer" that certain air-quality reports were willfully withheld from DEM. The trial justice paid particular attention to the testimony explaining the steel-dust-collecting equipment. He noted that Ocean State's pollution-control equipment collected only approximately 50 percent of the steel dust produced in the production process, commenting that "[t]hat constitutes substantial non-compliance [*sic* ]" with the consent agreement. Ocean State had represented that its pollution-control equipment would capture approximately 97 percent of the steel dust emitted during the production process. The trial justice specifically noted that

---

**2.** Stake testing is a procedure that measures opacity.

"[o]ne does not me[e]t the requirements of the consent agreement by installing monitors. The monitors are suppose[d] to perform to a certain capacity. That is what the permit says. That is the purpose of having them put in there to protect the workers and protect the environment and to protect the surrounding properties."

The trial justice focused on the fact that there was a substantial amount of evidence supporting the premise that the parties were well aware that it had been over two years since the final consent order was entered. During those two years Ocean State had not achieved compliance. He noted that the final amended order stated that all the pollution-control equipment was to be installed and modified no later than August 15, 1992. He noted that one year after that deadline Ocean State had still failed to comply with the consent order. The trial justice concluded that he had "no problem" in finding Ocean State in contempt of the final amended order.

Prior to imposing sanctions for the contempt finding, the trial justice allowed Ocean State to present evidence of the implications of and alternatives to closing the plant down. Porter testified that if Ocean State was forced to "shut down," that action would also force the closure of Ocean State's sister plant in Connecticut. Porter averred that a temporary shut down would also mean that the plant would permanently close. He also stated that if the plant were forced to operate with only one furnace, he could not recommend that a "majority shareholder should subsidize" such a procedure and the plant would therefore probably close in that case as well.

Porter admitted that air-pollution-control consultants had been retained by Ocean State and that they had identified equipment that was "available to bring Ocean State into compliance" with the permit. Parenthetically we also note a hypothesis forwarded by DEM. The DEM suggested that there was a direct correlation between the amount of steel dust generated and the amount of steel produced. The DEM conjectured that if the production of steel was scaled back to correspond with what appeared to be the limitations of the existing air-pollution-control

equipment, there might be a possibility of short-term compliance with the permit. We find no specific discussion of this hypothesis by Ocean State and believe that this suggestion may have been characterized as economically unfeasible by Ocean State.

After hearing the evidence offered at the contempt hearing, the trial justice informed the parties that he was "leaning very strongly towards closing this operation down." The trial justice granted Ocean State an additional seven weeks, which became ten weeks, to show "substantial improvement" in plant operations relative to compliance with the permit. The trial justice ordered full compliance with Ocean State's reporting and monitoring obligations and imposed a fine of $135,000. As a final admonition to Ocean State the trial justice stated that he was searching for a reason to keep the plant operating but cautioned Ocean State that adverse economic impact would not be a sufficient justification. He warned Ocean State that if he did not see "major steps towards compliance," he would close the plant down.

The hearing continued on September 22, 1993. At that hearing the trial justice noted that "improvement has been made" by Ocean State. He noted that Ocean State now admitted that it would take eighteen months before the plant could attain compliance with the permit. The trial justice reviewed records and reports summarizing the effect of the pollution-control equipment from DEM, Ocean State, and the air-pollution-control consultants. After analyzing the reports, he noted that the opacity readings had improved but were still not "good enough to pass permit muster." Consequently, on the basis of his prior holding of willful contempt, he ordered the plant closed. The trial justice stayed his order pending Ocean State's filing of a notice of appeal. This court then granted a further stay until such time as the matter was briefed, argued and a decision filed.

Ocean State raises several arguments on appeal, contending that the trial justice erred in finding it in contempt and in ordering Ocean State to close as a sanction for the contempt finding. The DEM submits that

the evidence supports the trial justice's decision.

 Ocean State first contends that the final amended order was ambiguous and that it was therefore improper for the trial justice to find it in contempt. Ocean State avers that the final order outlined initial measures to be instituted to achieve compliance with the permit and that if those measures did not achieve compliance, Ocean State was to implement additional DEM-approved procedures. Ocean State argues that the order was silent concerning what would occur if the additional DEM-approved procedures did not result in compliance with the permit regulations. Consequently Ocean State contends that the final order is silent and ambiguous regarding what steps, if any, Ocean State should have taken if implementation of the additional pollution-control procedures did not result in full compliance with the permit requirements.

The record reflects that the final order adopted a consent agreement voluntarily entered into by both Ocean State and DEM. A consent decree "is not properly a judicial sentence, but is in the nature of a solemn contract or agreement of the parties, made under the sanction of the court * * *. It binds only the consenting parties." Black's Law Dictionary, 410–11 (6th ed. 1990).

"Although a consent judgment receives a court's imprimatur, the judgment is in essence a contract between the parties to the litigation from which it is derived. Such a judgment is to be construed as a contract using the rules of construction applicable thereto." Trahan v. Trahan, 455 A.2d 1307, 1310 (R.I.1983).

It is submitted that Ocean State was represented by counsel, participated in the language chosen, and understood the clear import of the consent agreement. Id.; cf. United States v. Schafer, 600 F.2d 1251, 1253 (9th Cir.1979) (defendant who negotiated and consented to entry of a decree but took no steps to modify it was in no position to object to it or to rely on the vagueness of its language as a defense). Our review of the record does not disclose any judicial proceeding wherein Ocean State specifically sought interpretation or modification of the final order before the contempt hearing. An order must be complied with until it has been modified or dissolved. Trahan, 455 A.2d at 1311. "Therefore, if [Ocean State] questioned the application of the consent judgment, [its] proper redress was to seek judicial construction or modification of the judgment, not unilaterally to disregard it." Id.

It is a basic tenet of contract law that the contracting parties can make as "good a deal or as bad a deal" as they see fit, limited to some extent by certain rules of enforcement. See generally John D. Calamari and Joseph M. Perillo, The Law of Contracts § 1–3 at 6 (3d ed. 1987). The record clearly reflects that Ocean State entered into this agreement with full knowledge of its purported responsibilities. In fact it is submitted that in drafting this voluntary agreement, Ocean State probably possessed more expertise in the steel-production pollution-control area than did DEM. Ocean State represented to DEM that it would be able to meet the conditions of the permit. The final order clearly states that the permit "shall become incorporated herein" as part of the final order. The record also clearly reflects that Ocean State did not comply with the reporting requirements of the order, nor did it meet the opacity limitations as set forth in the permit. In fact we do not understand how DEM was supposed to suggest additional measures to cure Ocean State's pollution ills when Ocean State was not meeting its reporting requirements. A question arises, as the trial justice suggested, whether this nonfeasance was a willful action that may have contributed to preventing DEM from discovering the full scope of emission violations in a more timely manner.

We find it troubling that Ocean State is now contending that the agreement is ambiguous when it appears that Ocean State ignored it for a significant length of time. The record clearly reflects that Ocean State was not in compliance with the permit conditions and emission limitations.

"Failure to abide by a consent decree is a serious matter that deserves the attention of senior management of large corporations. This is especially true when the violations occur at physical cost to human beings. Corporations should 'internalize'

the cost of their pollution into their economic calculations. They will not do so unless they are made to abide by their agreements not to pollute." *United States v. Kelley,* 145 F.R.D. 432, 439 (E.D.Mich. 1993).

Relying upon the clear evidence of record of Ocean State's noncompliance with the agreement and its failure to challenge the language of the final amended order prior to the contempt hearing, we find its argument that the agreement was ambiguous to be disingenuous and meritless. The final order was clear and provided terms to enable Ocean State to delineate its responsibilities sufficiently. *School Committee of North Providence v. North Providence Federation of Teachers Local 920,* 468 A.2d 272, 276 (R.I.1983).

Ocean State next contends that the remedy imposed by the trial justice was a criminal contempt remedy and the appropriate due-process guarantees were not safeguarded. The DEM contends that the trial justice properly imposed sanctions under a civil contempt violation.

■■■ The trial justice found Ocean State to be in "civil contempt of the prior [c]ourt [o]rder entered by consent of the parties." "[T]he hallmark of civil contempt [is] the ability to purge the contempt at will * * *." *In re Carrie T.,* 516 A.2d 883, 885 (R.I.1986). Civil contemnors carry "'the keys of their prison [cell] in their own pockets.'" *Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622, 626 (1966). Criminal contempt punishes the contemnor for an act insulting or belittling the authority and dignity of the court whereas in civil contempt the purpose of the sanction imposed is to coerce the contemnor into compliance with the court order and to compensate the complaining party for losses sustained. *Ventures Management Co. v. Geruso,* 434 A.2d 252, 254 (R.I.1981).

■■■ Ocean State contends that the trial justice "offered no avenue by which Ocean State could purge itself of the contempt so as to allow it to reopen its facility." We do not agree. If Ocean State had satisfied the standards as set forth in the final amended order, standards of which it was well aware and to which it had agreed, then it would have been allowed to operate. As reflected in the initial consent agreement, Ocean State realized that a cessation of operations was a certain result of its noncompliance. The final order, entered January 7, 1992, provided that the previous two orders entered remained in full force and effect. Ocean State had agreed to "cease operations that contribute to violations of Regulations 1, 3, and 7 until the air pollution control equipment is operational *and in compliance with said regulations.*" (Emphasis added.) Additionally, alternatives to ceasing operations were discussed at the June 1993 meeting. Although Ocean State had installed specific pollution-control equipment, there is sufficient evidence before us that compels us to the conclusion that Ocean State was still in violation of the regulations outlined in the permit. The civil contempt order enforces coercive measures, and its sole purpose was to compel Ocean State into compliance with the order. *See State v. Ricci,* 609 A.2d 951 (R.I.1992).

■■■ Ocean State argues that assuming arguendo it was in civil contempt of the court order, it substantially complied with that order and therefore a continued finding of contempt was inappropriate. A finding of contempt is within the sound discretion of the trial justice. *Brierly v. Brierly,* 431 A.2d 410, 412 (R.I.1981). Findings of fact in a contempt hearing will not be disturbed unless they are clearly wrong or the trial justice abused his or her discretion. *Id.* "Civil contempt * * * is established when it is proved by clear and convincing evidence that a lawful decree was violated." *Trahan,* 455 A.2d at 1311. A finding of civil contempt must be based on a party's lack of substantial compliance with a court order, demonstrated by a failure of a party to "employ[ ] the utmost diligence in discharging [its] * * * responsibilities." *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C.Cir.1975). Substantial compliance must "depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Fortin v. Commis-*

*sioner of Massachusetts Department of Public Welfare,* 692 F.2d 790, 795 (1st Cir.1982).

 At the September 1993 hearing the trial justice admitted that Ocean State had made "substantial improvements in the manner in which" it operated. Nevertheless, the trial justice observed that since the July 1993 hearing there were "very few days when the readings were taken, that [opacity] violations were not recorded by [DEM]." He specifically stated that the opacity readings had improved but that they were still "not good enough to pass permit muster." The trial justice added that Ocean State had not met the permit standards for a "substantial period of time." In this instance substantial improvements do not equal substantial compliance. Although Ocean State's actions may have been substantial for the limited period from July 1993 to September 1993, they were not, however, sufficient to achieve compliance.

The record reflects that the initial consent agreement was executed in July 1990. At the signing of the initial agreement, Ocean State was well aware of its responsibility to comply with that agreement. The consent agreement was interpreted and amended on three separate occasions, concluding in a final amended order in January 1992. The DEM agreed to the conditions in the permit, incorporated into the final amended order, to afford Ocean State an opportunity to achieve what it stated it could accomplish in the original 1990 consent agreement. It appears that the amended orders were a result of Ocean State's pleas for flexibility. "There comes a time, however, when flexibility must give way to enforcement lest one party's failure to comply undermine the viability of the agreement which the parties reached and the Court approved as a workable solution to the problems presented." *Palmigiano v. DiPrete,* 700 F.Supp. 1180, 1193 (D.R.I.1988). We have now reached that crossroad of inflexibility, and flexibility must now give way to enforcement.

Ocean State could have taken the "substantial" steps that it took between July and September 1993 at any time prior to the imposition of the contempt order. This lack of diligence weakens any position that Ocean

State now adopts. In fact, after discussing the pollution problem with the air-pollution-control consultants in July 1993, Porter admitted that there was technology available to bring Ocean State into compliance with the permit. We wonder whether this matter would be before us now if those consultants had been contacted in July of 1990 instead of July 1993. However unfortunate this situation may be, we view it as a case of "too little, too late." The trial justice did not abuse his discretion in finding that Ocean State was in contempt of the final amended order.

 Ocean State next contends that the Superior Court failed to consider the necessary elements for issuing an injunction. We find this argument without merit and unsupported by the evidence of record. The record before us does not support the assertion that injunctive relief was granted. The trial justice found Ocean State to be in contempt of a prior court order entered into by consent of the parties. As noted above "the matter of determining and dealing with contempt is within the sound discretion of the trial justice * * *." *Brierly,* 431 A.2d at 412. "Once willful disobedience of an order of the court is shown, as here, it is within the discretion of the court to impose sanctions for contempt." *E.M.B. Associates Inc. v. Sugarman,* 118 R.I. 105, 109, 372 A.2d 508, 509–10 (1977). The record does not reflect that an injunction was issued, and thus we need not analyze this contention.

Ocean State next contends that the trial justice's order closing the plant is "draconian" and an abuse of discretion. Ocean State believes that the trial justice failed to consider the necessary balancing factors in issuing his order. The DEM contends that the trial justice's order was within his discretion on the basis of Ocean State's continued noncompliance with the consent order.

Our review of the record informs this court that the July 1990 consent agreement contained Ocean State's solemn promise to cease operations if the air-pollution-control equipment was not operational and in compliance with the regulations by July 31, 1990. The evidence of record also reflects that the con-

sent agreement was amended on three occasions. The initial order of the Superior Court extended the compliance date of the installation of certain pollution-control equipment to December 1990 and also contained Ocean State's specific agreement to cease operations if certain activities were not completed by specific dates. That order was amended in July 1991 to stipulate that Ocean State was to pay a fine of $30,000 and that the parties had until August 1991 to agree to the terms of a final order. The final order was entered in January 1992 and, among other factors, further extended Ocean State's compliance period. That order specifically provided that the previous orders remained in full force and effect. We believe that the final amended order clearly incorporates Ocean State's agreement to cease operations if it failed to comply with the pollution-control standards. The premise that Ocean State consented to this agreement does not entitle it to contravene it at this juncture.

 Ocean State contends that the trial justice's sanction was unreasonable and an abuse of discretion because the effect of the sanction would be closure of the Ocean State plant and that result would have a severe impact on the local and state economy. We do not question that the closing of any manufacturing plant that employs more than 100 workers would have an adverse economic impact; in fact, we agree that it would. The consequences of any layoff or of substantial unemployment for whatever cause is a detriment to any community. However, this court's sole function in this instance is to review whether the sanction imposed by the trial justice was reasonable and within his discretion. *Moran v. Rhode Island Brotherhood of Correctional Officers,* 506 A.2d 542, 544 (R.I.1986).

"[E]conomic infeasibility is not a proper basis for staying compliance with the Clean Air Act." *United States v. Wheeling–Pittsburgh Steel Corp.,* 818 F.2d 1077, 1087 (3d Cir.1987). In *Wheeling* the court noted that the Environmental Protection Agency's position would force the closure of a steel-recycling plant. *Id.* at 1088. While considering that important factor, the court noted that "[w]hile continued operation of steel facilities

may advance a state's economic interest, the [federal] Clean Air Act reflects a congressional policy decision that removal of pollutants from the air which endanger the lives and health of the populace is a more compelling public interest." *Id.* It is submitted that the Clean Air Act of this state reflects the same policy decision. General Laws 1956 (1989 Reenactment) § 23–23–2 provides that

"[i]t is hereby declared to be the public policy in the state of Rhode Island to preserve, protect, and improve the air resources of the state so as to promote the public health, welfare, and safety, to prevent injury or detriment to human, plant, and animal life, physical property and other resources, and to foster the comfort and convenience of the state's inhabitants."

The factors of record we now review reveal Ocean State's dismal history of misperformance, noncompliance, and delay. However unfortunate the outcome, Ocean State has created the circumstances it must now confront. "It is clear that sanctions for civil contempt may be sufficiently coercive to gain swift compliance." *Marek v. Marek,* 119 R.I. 841, 844, 383 A.2d 1031, 1033 (1978). We believe that Ocean State "lacked diligence in pursuing compliance. [A]ny hardship in complying with the * * * regulations was 'largely self-imposed, in that it results from prior business decisions.'" *Ekco Glaco Corp. v. Illinois E.P.A.,* 186 Ill.App.3d 141, 147, 134 Ill.Dec. 147, 151, 542 N.E.2d 147, 151 (1989) (affirming a state-pollution-control board decision denying a corporation an extension of a variance from air-pollution-control regulations in light of the probable result of the closure of the plant, based on the corporation's previous failure to comply with the regulations and its lack of a firm compliance plan).

Business entities can no longer ignore the adverse environmental impact of their operation, nor can industrial enterprises ignore court orders. It is our belief that Ocean State, by its own volition, was involved in a very high-stakes game of brinkmanship. It now must absorb the consequences of its actions. We are persuaded that the trial justice's reasoning for ordering the sanction of plant closure was not imposed with the

intent to close Ocean State permanently. Rather it was imposed to convince Ocean State that it must comply with the consent agreement to which it was an informed party for an extended period. We now hope that that occurs.

Consequently, in reviewing Ocean State's repeated failure to comply with the consent order, the trial justice did not abuse his discretion in imposing the sanction of plant closure until Ocean State came into compliance with the consent order.

For the reasons heretofore stated, Ocean State's appeal is denied and dismissed. The judgment of the Superior Court is affirmed, and the papers of the case are remanded to the Superior Court.