THE CITY OF MENDOTA, Plaintiff-Appellant, v. THE POLLUTION CON-
TROL BOARD *et al.*, Defendants-Appellees.

Third District   No. 3—89—0270

Opinion filed January 5, 1990.

Michael S. Guilfoyle, of Mendota, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Patricia E. Collins, Michelle D. Jordan, and Matthew J. Dunn, Assistant Attorneys General, of Chicago, of counsel), for appellees.

JUSTICE STOUDER delivered the opinion of the court:
This is an appeal from an opinion and order dated April 6, 1989, of the Illinois Pollution Control Board (the Board) pursuant to section 41(a) of the Illinois Environmental Protection Act (the Act) (Ill. Rev.

Stat. 1987, ch. 111½, par. 1041(a)). In its order, the Board denied appellant's, the City of Mendota's (the city's), request for site-specific relief from section 306.304 of the Board's water pollution regulations, which prohibits overflows from sanitary sewers. 35 Ill. Adm. Code §306.304 (1985).

The city owns and operates a sewage treatment plant and a separate sanitary sewer water system which serve approximately 7,000 persons and discharge into Mendota Creek and the Little Vermilion River. The plant has a design maximum flow of 2.8 million gallons per day (mgd), and can provide tertiary treatment for 1.8 mgd. Two excess flow lagoons are also located at the plant. Excess flows to the plant are bypassed to the "west" lagoon, then to the "east" lagoon. The effluent from the ponds discharges to the Little Vermilion River (without chlorination) and averages 20 milligrams per liter (mg/1) of five-day biochemical oxygen demand and total suspended solids. The effluent rarely exceeds 30 mg/1 for either parameter.

During wet conditions, the city finds it necessary to allow excess flows to bypass the system, thereby allowing raw sewage to pass directly into Mendota Creek and the Little Vermilion River. A bypass refers to an intentional discharge of wastewater prior to complete treatment necessary to prevent operational problems within a facility. The city upgraded its system in 1977 for the intended purpose of reducing infiltration and eliminating sewage bypassing. Bypassing continues to occur, however, at seven locations.

In June 1983, the Board granted the city a variance from section 306.304 of the Board's regulations. That variance expired on September 10, 1984, and the city did not attempt to renew the earlier variance until December 10, 1985, when the city requested a two-year variance to continue operation of seven overflow locations. The Board denied the city's petition, and this court affirmed the Board's decision. See *City of Mendota v. Pollution Control Board* (1987), 161 Ill. App. 3d 203, 514 N.E.2d 218.

On January 15, 1988, the city filed a petition with the Board seeking site-specific relief. The rulemaking petition proposed a site-specific exemption for five location points which allow untreated discharge to flow into receiving waters during high flow periods. In accordance with section 28 of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1028), a hearing was held on August 5, 1988, concerning the city's petition.

At this hearing, the record from the 1985 variance request was incorporated into the proceeding. In its 1985 petition for a variance, the city proposed several changes that it has made or intends to make in the future. The city installed a recirculation line from its east lagoon

to the tertiary treatment facility in order to enable the lagoon to handle higher volumes during wet conditions and a motorized gate valve at the head of the plant to control flows into the plant when an operator is not on duty. The city's witnesses stated, however, that these measures would not eliminate the need for bypassing.

The city highlighted other work it had been doing to improve the system. The city used dye and smoke to determine where the storm sewers were running into the sanitary sewers and made corrections to the system eliminating the detected bypasses. The city is also repairing leaking manholes, relining sewers to prevent infiltration of surface waters, repairing broken tiles in its storm sewers and catch basins, and recently passed an ordinance requiring downspouts that drain into the city sewer system to be permanently blocked.

The city further contends that the engineering firm it utilized for the 1977 system upgrade severely underestimated the volume of infiltration into the system. Richard Spencer, an engineer hired by the city, stated that the engineers responsible for the 1977 project erroneously estimated the inflow into the system for a five-year storm. The engineers on the project estimated that for a five-year storm the maximum inflow to the plant would be 5.8 mgd. Spencer testified that for a five-year storm there would be 11,389,000 mgd delivered to the treatment plant. As a result, the city maintains that inadequate modifications were made to the system, which makes the treatment plant unable to meet the regulations and guidelines set forth in the Act. The city also warns that if it is not permitted to bypass, sewage backs up into the basements of approximately 75 residents, 8 to 10 times a year.

In addition, Spencer testified as to two studies conducted by his consulting firm on behalf of the city. The first study proposed a $1.6 million plan to upgrade the system. This upgrade would reduce the number of bypasses to two or three a year. Spencer also declared that in order to eliminate bypasses entirely, the sewer system would need to be completely replaced at a cost in excess of $14 million. The results of the second study, a stream assimilation study, indicate the overflows and bypasses do not adversely affect the water quality of the streams. According to Spencer, even if the overflows were eliminated, there would not be any significant improvement in the general water quality of the stream.

Michael Wasmer, the city clerk, testified as to the financial condition of the city. Wasmer stated that the city was essentially in the same financial condition as in 1985. At that time, the city had the fifth highest tax rate in La Salle County, and ranked 34th among 37

communities in per capita income. Wasmer also noted that the community is, for the most part, elderly.

In its opinion and order, the Board denied the city's petition for site-specific relief for two reasons: first, the Board determined that the city, by presenting evidence on only limited alternatives, had not met its burden of establishing that compliance was technically infeasible and economically unreasonable; and secondly, the Board concluded that allowing the city's petition would discourage efforts to improve the environment, and thus, would not be consistent with the statutory purpose of restoring, maintaining, and enhancing the purity of the State's waters.

On appeal the city raises two issues: (1) whether the Board acted arbitrarily, capriciously, or unreasonably in determining that the city had not proven it was technically infeasible or economically unreasonable to comply with the Board regulation prohibiting overflows from sanitary sewers; and (2) whether the Board acted arbitrarily, capriciously, or unreasonably in its consideration of environmental factors in view of the statutory purposes of the Act.

■ Initially, we note that it is not for this court to determine whether the Board's action was wise, or even if it is the most reasonable action based on the record. (See *Massa v. Department of Registration & Education* (1987), 116 Ill. 2d 376, 507 N.E.2d 814.) The Board is made up of technically qualified individuals, and its technical determinations must be upheld unless arbitrary and capricious. (*Central Illinois Public Service Co. v. Pollution Control Board* (1987), 116 Ill. 2d 397, 507 N.E.2d 819.) Moreover, in considering whether or not to adopt proposed site-specific relief, the Board is statutorily required to take into account the existing physical conditions, the character of the area of surrounding land uses, zoning classifications, the nature of the existing receiving body of water and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution. (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a).) Upon our review of the record, we conclude the Board's determination that the city failed to demonstrate compliance is technically infeasible and economically unreasonable is amply supported by the record.

■ The city first argues the Board's decision was arbitrary, capricious, and unreasonable for compliance with the statute is technically infeasible. The city contends that in order to technically comply with the statute, the entire sewer system would have to be rebuilt, at a cost of $14 million, or the city would have to incur massive sewage back up and basement flooding. It is apparent that the heart of the city's argument is that technically feasible methods of preventing

overflows are economically unreasonable. Therefore, the Board properly determined that technical feasibility is not an issue in this proceeding.

The city next argues that the Board's decision was arbitrary and capricious because it is economically unreasonable to rebuild its entire sewer system. The city asserts they have two alternatives; either rebuild the entire sewer system at a price of $14 million, or to accept the fact that raw sewage will back up into many basements in the city following heavy precipitation. The city maintains that it is unreasonable for a city of approximately 7,000 citizens to spend $14 million dollars on a new sewer system in order to eliminate occasional bypassing which has little detrimental environmental impact on the waterways.

Counsel for the Illinois Environmental Protection Agency (IEPA) submitted comments in opposition to the city's petition. The IEPA based its opposition to the petition on, among other things, the city's failure to submit flow data for any of the discharge points and the city's failure to submit compliance alternatives to the Board. The IEPA opposes the allowing of discharges into waterways that are of poor water quality because such discharges are not consistent with the restoration and enhancement principles of section 11(b) of the Act. The IEPA recommended that the city continue its recent efforts to find infiltration and inflow sources in lieu of site-specific relief.

■ The Board agreed with the IEPA's assessment of the situation. The Board noted that the city failed to submit sufficient alternatives to the two alternatives posed. After reviewing the record, it is evident that the Board did not act arbitrarily and capriciously in making this determination.

■ The city's final argument is that the site-specific relief should be granted because the overflows and bypasses cause little or no adverse environmental effects. The city asserts the stream assimilation study, prepared on its behalf, indicates that upstream and downstream water samples were not adversely affected by the overflows and bypasses. The study indicates the water stream quality standard is no better than and in some circumstances worse than the downstream quality beyond the bypasses. The city directs the court's attention to section 304.103 of the Illinois Administrative Code, which states in part: "[I]t is not the intent of these regulations to require users to clean up contamination caused essentially by upstream sources or to require treatment when only traces of contaminates are added to the background." (35 Ill. Adm. Code §304.103 (1985).) This provision, however, is not determinative of the issue at hand. We note that what the city essentially argues is that since pollution of the wa-

ter already occurs from sources in addition to the city, the city should be given site-specific relief. We disagree. The General Assembly passed the Act in order to overcome this mentality and granting site-specific relief defeats the legislative purpose of the Act.

The Board determined that if it granted site-specific relief before the city depleted its opportunities to eliminate infiltration and investigate other compliance plans, the city would lose its incentive to pursue these options and the potential for environmental improvement would be forfeited. We agree with the Board's decision and also note that the city's petition seeks relief of a permanent nature, in contrast to the city's previous request for a variance as temporary relief from section 306.304 of the Board's water pollution regulations. The record shows, moreover, such permanent relief has never been granted for sanitary sewer overflows.

This court does not find the Board's decision on this issue to be arbitrary and capricious. The legislature passed the Act to "restore, protect and enhance the quality of the environment." (Ill. Rev. Stat. 1987, ch. 111½, par. 1002(b).) There is no hidden legislative purpose to be gleaned from the statute. The purpose of the Act is to keep the waters of this State clean. We appreciate the great expense the city might incur if it replaces its entire sewer system, and we applaud the city's recent efforts in detecting the whereabouts of infiltration and inflow sources. This court is not persuaded, however, that this case warrants a site-specific exemption to the sewer overflow standard set forth in section 306.304 of the Board's water pollution regulations. 35 Ill. Adm. Code §306.304 (1985).

We conclude, therefore, that the decision of the Board was not arbitrary and capricious. Consequently, for the reasons stated herein, we hereby affirm the Board's order denying the city's petition.

Affirmed.

SCOTT and BARRY, JJ., concur.