April 15, 2024

In re N.B.                          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re N.B.            :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.**  This case came before the Supreme Court on appeal by the Department of Children, Youth, and Families (DCYF or the department), from an order finding it in contempt for failing to place N.B.[1] at St. Mary's Home for Children (St. Mary's),[2] as ordered by the Family Court.  On appeal, DCYF submits that the hearing justice committed a variety of errors.  First, DCYF argues that the hearing justice abused his discretion by finding that it had not

---

[1] N.B. was a minor at the time of the proceedings, so we refer to her using her initials to respect her privacy.

[2] St. Mary's is a nonprofit agency that cares for children facing psychiatric illness, sexual abuse and trafficking, and special-education challenges. *See* St. Mary's Home for Children, *About Us*, https://www.smhfc.org/about-us/ (last visited Apr. 3, 2024). The facility offers three program areas: (1) residential services to children ages six to eighteen; (2) outpatient services to support those impacted by sexual abuse, exploitation, and other trauma such as family violence or physical abuse; and (3) a residential and day school that provides highly structured, individualized special-education instruction and therapeutic services for K-12 students with learning, social, emotional, and behavioral challenges. *Id.*

exercised reasonable efforts to place N.B., and thus it was an error to order the child's placement at St. Mary's because the evidence demonstrated that N.B. could not be placed at that facility and DCYF had made substantial efforts to place her there and at other appropriate facilities. Second, DCYF challenges the hearing justice's finding that it had failed to demonstrate that it was not possible to comply with the placement order as the department had put forth testimony and evidence of its efforts to place her in an appropriate level of care, and that no placement was available. And lastly, DCYF challenges the hearing justice's decision to impose a contempt sanction for the benefit of N.B. For the reasons stated herein, we vacate the order of the Family Court.

**Facts and Travel**

N.B. became involved with DCYF on August 10, 2021, when the department filed a neglect and dependency petition in Providence County Family Court alleging that she "requires the protection and assistance of the [c]ourt due to the inability of the mother, through no fault of the mother, to provide the child with a minimum degree of care or proper supervision because of the special medical, educational or social service needs of the child which the mother is unable to provide." Laura Bailey, in her capacity as a Child Protective Investigator for DCYF (Investigator Bailey), filed an affidavit in support of the petition. The affidavit detailed a series of events that preceded DCYF's filing of the petition. Investigator Bailey reported

that on August 7, 2021, N.B. was involved in an altercation in which she was caught drinking alcohol and had assaulted her mother and younger brother. N.B. was transported to Hasbro Children's Hospital (Hasbro or hospital) for evaluation. The Hasbro emergency-room staff evaluated N.B. but refused to admit her, indicating that she did not meet the criteria because she was "not homicidal or suicidal." At discharge, N.B.'s mother refused to take her home out of concern for herself and N.B.'s younger sibling's safety. N.B. was placed on a seventy-two-hour hold at the hospital and treated for her high blood-sugar levels.[3] After the incident, N.B. was placed with her maternal grandmother.

Investigator Bailey also proffered that N.B.'s mother was "visibly upset about the situation" and expressed concerns about her daughter's ongoing behavioral issues. In the months prior, N.B. had assaulted her mother and sibling multiple times.[4] N.B's mother also informed Investigator Bailey that she had tried home-based care for her daughter's insulin regimen, therapy, and psychiatry, but "nothing seemed to work" because her daughter refused the care. After a hearing on August

---

[3] Approximately four years earlier, N.B. was diagnosed with Type I juvenile diabetes after she was rushed to the hospital on the first day of school because school personnel were concerned by her dramatic appearance; she weighed only fifty-five pounds.

[4] Prior to the August 7 incident, N.B. had been in and out of both Bradley Hospital and Hasbro Children's Hospital on at least nine occasions and the Providence Police Department had responded to the home due to her behavior numerous times. Her mother expressed concern to Investigator Bailey that N.B. was sexually active and using alcohol and marijuana.

13, 2021, an order granting DCYF temporary custody of N.B. was entered on September 13, 2021. The order required that both in-state and out-of-state placement referrals be made for the child. The department was also ordered to update the Office of the Child Advocate (OCA) incrementally as to its efforts to place N.B. in a more suitable placement.

After an incident on August 14, 2021, in which N.B. was caught stealing and threatened her grandmother, she was once again transported to Hasbro via ambulance, and admitted to the hospital as a social admission. DCYF pursued an emergency placement for N.B. at St. Mary's on August 16, but after a phone conversation, the facility indicated it could not meet N.B.'s needs. The department began making referrals on August 23 and contacted at least seven different placements, to no avail. On October 21, DCYF provided a letter to inform the court of its additional efforts to place N.B. outside of Hasbro. At that point, DCYF had made fourteen referrals to in-state and out-of-state facilities on behalf of the child, but her placement at these facilities was either denied or pending review. Thereafter, CASA sought a Family Court review of whether DCYF had made reasonable efforts to place N.B. at an appropriate placement outside of the hospital.[5]

---

[5] At a later hearing, N.B.'s mother expressed concern that the care at Hasbro was inadequate given that she was not receiving any services and spent most days watching TV, playing Xbox, or painting. At the hospital, N.B. was not provided with any educational or mental-health services.

At the October 28 review hearing, Christopher Strnad (Strnad), the chief of the Children's Behavioral Health Unit at DCYF, detailed the agency's efforts to place N.B. outside of Hasbro. He explained that several out-of-state residential centers stated that they could not take N.B. because there were no beds available and the centers could not properly care for her diabetic needs. Strnad also testified that DCYF had contacted five other in-state agencies, but he felt none could meet N.B.'s needs due to a "mix of her behavioral health, [and] medical needs" and "a pretty dire situation with the lack of staffing at the program," in part due to the ongoing COVID-19 pandemic. St. Mary's had denied emergency placement for N.B. and expressed to DCYF that it could not meet the minor's diabetic care needs due to her noncompliance with her insulin regimen. The department offered to provide the facility with 24/7 nursing care, and St. Mary's initially indicated it would be open to discussing the possibility of accepting N.B. under those circumstances. However, DCYF had not come to a final agreement with St. Mary's; the facility offered a willingness to accept N.B. under these circumstances, but DCYF "[did] not have a final yes or no."

According to Strnad, DCYF had been attempting to hire nurses to monitor N.B.'s diabetic care needs. During the hearing, Strnad cited the department's frustrations. Strnad stated that, over the course of his eleven-year tenure at DCYF, he had never had a situation where the department agreed to provide staffing and he

"had specific conversations that we needed to figure this out, and try to secure the resource." The department was constrained by the administrative process, because it had to first identify an agency through the Master Price Agreement.[6] DCYF began having conversations about supplying nursing staff to St. Mary's in the middle of September 2021 and the first conversation with a qualified vendor occurred on October 13. The qualified vendor was tasked with hiring nurses to provide for N.B.'s care. DCYF had no control over the job posting or hiring process. The department continued to communicate with St. Mary's throughout the process of attempting to hire nurses; however, there was difficulty filling the positions due to staffing shortages and other complications. Specifically, the positions DCYF had to fill were at a lower pay scale and in a more stressful environment than other available nursing jobs. Strnad also testified regarding DCYF's other efforts to place N.B. out of state and why placement was ultimately denied at those facilities. There was some hope that Mount Prospect Academy in New Hampshire would take N.B., but a bed would not be available at that facility for several more months.

---

[6] The Master Price Agreement (MPA) "cover[s] requirements for universal need for goods or services for a specified contract period on a state wide basis." State of Rhode Island Division of Purchases, *Master Price Agreements FAQs*, https://purchasing.ri.gov/stateagencyinfocenter/docsforms/purchases-mpa-faqs.pdf (last visited Apr. 3, 2024). This is seen among state agencies as a way to connect to qualified vendors and expedite the process to secure needed goods or services. *Id.*

After hearing testimony and reviewing the evidence adduced at the hearing, the hearing justice found that DCYF had not made reasonable efforts to appropriately place the child and that her rights under the Children's Bill of Rights, G.L. 1956 § 42-72-15, had been violated.[7] The hearing justice acknowledged that the "social worker here acted swiftly," DCYF "followed up on placement referrals," and put together referral packages within "a reasonable period of time." But his concern was that Hasbro was not a suitable residential placement for a child and it was not clear why DCYF went through an administrative process to retain the nurses needed to provide supplemental care for N.B., as "the Children's Bill of Rights, due process, the United States Constitution, or the Rhode Island Constitution, would trump any of those procedural, administrative requirements for an agency to place a child." He stressed that at the hospital N.B. was not receiving proper care; she was not attending school, had no tutoring, mental-health counseling, behavioral treatment, or exercise, and she was primarily confined to a room where she was watched by hospital staff 24/7.[8] The hearing justice further found that N.B.'s

---

[7] In relevant part, G.L. 1956 § 42-72-15 provides that "[n]o child placed or treated under the supervision of the department in any public or private facility shall be deprived of any personal property or civil rights, except in accordance with due process." Section 42-72-15(a).

[8] At this point, N.B. had been in the hospital room for over two months. She had no interactions with anyone other than her mother and the nursing staff. She was not allowed internet access due to her past behavior and the hospital staff's concerns. Therefore, her interactions with the outside world were almost nonexistent.

condition was deteriorating based on the circumstances of her placement at Hasbro. As such, he ordered that N.B. be placed at St. Mary's and that DCYF "provide the appropriate medical care [and] nursing [care] to address [the] child's particular medical needs consistent with the diabetic treatment plan or any treatment plan from Hasbro Children's Hospital" on October 29, 2021. An order memorializing these directives was entered on November 8, 2021. Thereafter, an amended order with additional factual findings entered on November 12, 2021.[9]

On November 3, 2021, CASA filed a motion to adjudge DCYF in contempt for its failure to place N.B. at St. Mary's. At a hearing on November 8, the department expressed that it had discussed N.B.'s placement with a director at St. Mary's. The director informed DCYF that a bed would be available in a few weeks but that it was being held for another child in DCYF's care. Counsel for DCYF indicated that it "had to make a decision and choose which child will be placed" at St. Mary's. However, even if a bed became available at St. Mary's, the department had not yet secured the nursing staff necessary to care for N.B.'s diabetic needs and placing her without such care would be "reckless[]." DCYF also updated the court on its efforts to place N.B. at an out-of-state facility.

---

[9] The parties do not dispute that the November 12, 2021 amended order is the operative document with respect to the October 27, 28, and 29 hearings.

The court heard testimony on November 10 and 12, 2021, regarding CASA's motion to adjudge DCYF in contempt. At the hearing, Doctor Brian Alverson (Dr. Alverson), the director of the division of pediatric medicine at Hasbro and N.B.'s attending physician, testified that the "profound social isolation" was harmful to N.B.[10] Doctor Alverson further testified that there was no "medical or psychiatric reason for [N.B.] to be hospitalized." Moreover, he testified, nurses were not necessary to treat her diabetic condition. Doctor Alverson stated that anyone with an early high-school education, including the child herself, could administer insulin. Ultimately, Dr. Alverson expressed that a hospital is no place for a child in N.B.'s situation and that her isolation coupled with the ongoing COVID-19 pandemic, which was "driving depression and anxiety to unprecedented levels" for young people, made "the risk of continued hospitalization * * * and the social outcome of what will happen as a result" far greater than the risk that her diabetic needs would not be met.

DCYF further detailed its efforts to place N.B. at St. Mary's but, due to recent staffing challenges related to the pandemic, the facility had experienced a reduction in capacity and could not provide a bed at that time. The hearing justice found that

---

[10] We pause to acknowledge that Dr. Alverson chose to testify in this matter, not because he was asked by any party to the case or subpoenaed to do so, but due to the severity of the situation and the ongoing harm to N.B. He showed up in court of his own volition.

Hasbro was not an appropriate placement for N.B. as it was not a home, nor could it provide the structure she needs. He based his findings, in part, on Dr. Alverson's testimony regarding the terrifying "social isolation impacts on [the] child" and that the child did not need any additional medical supervision to manage her diabetes when appropriately placed. The court explained that DCYF was made aware of this "back in early August," and although there was another child in need of a similar placement, the justice was "satisfied that, in fact, there [were] residential treatment facilities that could accommodate both of those children."[11] Indeed, he pointed out that St. Mary's had a trauma unit for emergency cases where N.B. could go until she could "be placed at a higher level [of care]." Accordingly, the hearing justice found DCYF in willful contempt of the October 29 order. The court reasoned that, despite undertaking efforts immediately, "the [d]epartment ha[d] the means and the ability to be able to address [N.B.'s] need in some other fashion with some accommodations" and although DCYF was constrained by the administrative process to hire nurses, "there are exceptions" such as when a party is under court order. He explained that the situation was "dire"; for eighty-eight days N.B. had

---

[11] We are cognizant that N.B. was not the only child who DCYF was unable to place during this time, having heard oral argument on a similar case—DCYF's appeal of a contempt order holding it in contempt for failing to place another child, N.D., in the fall of 2021—on the same day. These two cases were heard in the Family Court contemporaneously. Nevertheless, no class of aggrieved children was formed, and no special master was appointed to investigate DCYF's operations in either case.

been confined to her hospital room, receiving no education, clinical support, exercise, or other privileges. The hearing justice also ordered the parties to determine the cost of the hospital stay per day and place the funds in a trust account for the minor retroactive to October 29, 2021.[12] A decree was entered on November 18, 2021, finding DCYF in willful contempt of the court's order because it had not made reasonable efforts to place N.B.

On November 23, 2021, DCYF filed a motion to modify or vacate the court's order to place N.B. at St. Mary's because the facility had declined to admit the minor and it was "now an impossibility for DCYF to be able to comply with the [c]ourt's orders." The department relied on letters from a psychiatrist and nursing director at St. Mary's categorically denying N.B.'s admission to the facility. The letters were dated November 18 and 19. At the November 29 hearing, the Executive Director of St. Mary's testified that the facility had denied N.B. because it "could [not] adequately support her with her insulin-dependent diabetes" due to her noncompliance. It was reiterated that St. Mary's was experiencing a staffing crisis related to the ongoing COVID-19 pandemic and had expressed concerns about hiring an outside firm to come into the facility. Based on St. Mary's refusal to accept

---

[12] The court later modified that portion of the order to provide that DCYF would be sanctioned $1,000 per day until it purged itself of the contempt, as opposed to the per diem cost of the child's hospitalization. The order entered on December 17, 2021.

N.B., the hearing justice granted DCYF's motion to modify the placement order and denied the motion to vacate on November 29. He stated that, although St. Mary's was not going to accept N.B., DCYF still needed to place her "forthwith in an appropriate level of care," to ensure that her medical needs were satisfied "either by providing the level of staffing necessary to ensure that, or funding the agency * * *." The order memorializing this directive entered on December 23, 2021.

On December 8, 2021, DCYF filed a notice of appeal of the court's November 18 and 19 orders. On January 14, 2022, N.B. was discharged from Hasbro to her mother's home after spending over 150 days at the hospital. On January 31, the Family Court determined that DCYF had purged itself of contempt as N.B. had been discharged from Hasbro on January 14 and returned to live with her mother.

**Standard of Review**

"Both the Legislature and this Court have recognized that the Family Court, although a statutory court, has inherent power to punish contempt of its authority * * *." *Porter v. Porter*, 684 A.2d 259, 261 (R.I. 1996); *see also* G.L. 1956 § 8-6-1 (codifying the Superior Court's power to punish contempt of its authority); G.L. 1956 § 8-10-38(a) (conferring like powers upon the Family Court "as are conferred upon the [S]uperior [C]ourt by the provisions of § 8-6-1"). "A contempt finding requires a party to demonstrate, 'by clear and convincing evidence, that a sufficiently specific order of the court has been violated.'" *Harris v. Evans*, 250 A.3d 553, 560

- 12 -

(R.I. 2021) (quoting *Town of Coventry v. Baird Properties, LLC*, 13 A.3d 614, 621 (R.I. 2011)). We accord "'great deference to a trial justice's finding of contempt[,]' and we will not disturb those findings unless they are clearly wrong or the trial justice abused his or her discretion." *Id.* (quoting *Town of Coventry*, 13 A.3d at 621). "Nor will this Court 'substitute our reading of the evidence for that of the trial justice if the record supports the [trial] justice's findings.'" *Id.* (quoting *Now Courier*, *LLC v. Better Carrier Corp.*, 965 A.2d 429, 434 (R.I. 2009)). "Findings of fact in a contempt hearing will not be disturbed unless they are clearly wrong or the trial justice abused his or her discretion." *Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 704 (R.I. 1994).

When reviewing the sanction imposed for civil contempt, this Court's review "is limited to a review of the order to ensure that the terms are reasonable." *Moran v. Rhode Island Brotherhood of Correctional Officers*, 506 A.2d 542, 544 (R.I. 1986). "We apply a *de novo* standard of review, however, to questions of law * * *." *State v. Lead Industries Association, Inc.*, 951 A.2d 428, 464 (R.I. 2008).

**Discussion**

On appeal, DCYF argues that the hearing justice abused his discretion by finding that it had not exercised reasonable efforts to place N.B., and argues it was an error to order the child's placement at St. Mary's because the evidence demonstrated that N.B. could not be placed at that facility and DCYF had made

substantial efforts to place her there and at other appropriate facilities. DCYF also challenges the hearing justice's finding that it had failed to demonstrate that it was not possible to comply with the placement order as the department had put forth testimony and evidence of its efforts to place her in an appropriate level of care, and that no placement was available. And lastly, DCYF challenges the hearing justice's decision to impose a contempt sanction for the benefit of N.B.

In response, CASA argues, on behalf of N.B.,[13] that this Court should affirm the hearing justice's finding of civil contempt and that his rejection of the department's impossibility defense was not erroneous. Likewise, for its part, OCA[14] maintains that the hearing justice's finding of civil contempt was proper and the court properly rejected DCYF's impossibility defense. We take each issue *seriatim*; but at the outset, we must first address the apparent confusion regarding the placement order as to which DCYF was held in contempt.

Our review of the record indicates that the hearing justice ordered that N.B. be placed at St. Mary's forthwith on October 29, 2021. These instructions were not

---

[13] N.B.'s mother and father filed motions to join CASA's argument, which we granted.

[14] The Office of the Child Advocate (OCA) consists of an appointed child advocate and staff who are responsible for reviewing DCYF operations. G.L. 1956 §§ 42-73-1 to -7. The OCA's duties include reviewing the facilities where children are placed and recommending changes in the procedures for providing childcare and treatment. Sections 42-73-7(4), (5). The OCA is authorized to "[t]ake all possible action including * * * formal legal action, to secure and ensure the legal, civil and special rights of children * * *." Section 42-73-7(6).

reduced to a formal, written order until November 8. As in other cases, "Dependency and Neglect Action (DNA) Hearing Sheets"[15] were used by the hearing justice, which contained handwritten instructions directing DCYF to place the child at "St. Mary's forthwith and * * * to fund appropriate medical care if St. Mary's is unable to provide [it]." Although counsel for DCYF indicated at oral argument that this is common practice in the Family Court, we remain troubled by the lack of consistency in the record regarding the use of DNA Hearing Sheets versus the entry of formal orders, and the failure to enter the orders *nunc pro tunc*.[16] In the past, we have looked disfavorably upon the use of event hearing sheets as decrees or orders because it lacks clarity. *See In re Ephraim L.*, 862 A.2d 196, 199 n.6 (R.I. 2004). We can only review a finding of civil contempt if a formal order was entered. *Vecchio v. Women & Infants Hospital*, 293 A.3d 842, 848 (R.I. 2023) ("The court speaks through its orders."); *In re Court Order Dated October 22, 2003*, 886 A.2d 342, 349 (R.I. 2005) ("The question of clarity does not even arise if one is not put on notice that the order is in place."). Although the hearing justice ordered DCYF to place N.B. at St. Mary's on the record on October 29, 2021, and expected that directive to be

---

[15] Dependency and Neglect Action (DNA) Hearing Sheets are utilized by the hearing justice in dependency and neglect matters. The document is handwritten and signed by the hearing justice and kept in the court's record.

[16] The formal orders are often more extensive than the handwritten DNA Hearing Sheets. Nevertheless, DCYF acknowledged its full understanding of the court's directive given on October 29 and cultivated efforts to comply prior to the entry of the formal order on November 8.

followed, the formal order was not entered until November 8 and an amended order entered on November 12. We caution that the best practice is to enter formal orders; and, when expediency requires, the orders should be entered *nunc pro tunc*.

Before this Court, DCYF argues that the hearing justice erred in his finding that DCYF had not exercised reasonable efforts to place N.B. and in ordering the department to place her at St. Mary's, because the evidence adduced at the hearings demonstrated that the minor could not be placed at that facility and DCYF had made substantial efforts to place N.B. there and at other appropriate placements. We agree. Notably, neither CASA nor OCA addresses DCYF's primary argument that the hearing justice abused his discretion in finding at the review hearings that DCYF had not exercised reasonable efforts to place N.B.

In reviewing the hearing justice's findings in a contempt hearing, we are mindful that we disturb such findings only if the hearing justice was "clearly wrong or * * * abused [their] discretion." *Gardiner v. Gardiner*, 821 A.2d 229, 232 (R.I. 2003) (quoting *Durfee*, 636 A.2d at 704). It is well settled that "[a] finding of civil contempt must be based on a party's lack of substantial compliance with a court order, which is demonstrated by the failure of a party to 'employ[] the utmost diligence in discharging [its] * * * responsibilities.'" *Id.* (quoting *Durfee*, 636 A.2d at 704).

Our review of the record reflects that DCYF acted quickly to secure a placement for N.B. On August 16—days after DCYF was granted temporary custody of N.B.—the department sought an emergency placement for N.B. at St. Mary's. The facility refused to admit her due to a combination of her medical needs and behavioral issues. Undeterred, the department began making referrals for N.B. to be placed outside of Hasbro immediately. Indeed, DCYF had contacted at least fourteen potential placements at both in-state and out-of-state facilities. Notwithstanding DCYF's efforts, the out-of-state facilities would not accept N.B. due in part to a lack of availability, based on staffing shortages related to the ongoing COVID-19 pandemic, and in part because of her noncompliance with her insulin regimen.

The record is clear that DCYF also had ongoing conversations with St. Mary's, the only residential placement in Rhode Island for teenage girls. St. Mary's initially rejected N.B.'s emergency placement in August, but through ongoing discussions with DCYF, the facility indicated that it might be willing to accept N.B. with additional nursing care. However, the hearing justice overlooked the fact that DCYF, as a state agency, was obligated to comply with the established procurement process in order to secure the nursing care N.B. needed. Indeed, DCYF began having conversations in September about how to hire and fund the nursing care for N.B., something that Strnad testified he had never encountered in his eleven years

working for the department. DCYF communicated with the identified agency on October 13. The department continued to communicate with St. Mary's throughout the hiring process but had difficulty filling the positions due to ongoing nursing shortages, in large part because of the COVID-19 pandemic.

This is not a situation where the department sat on its hands and made no attempt to address the problem or comply with the court's order. *See, e.g.*, *Gardiner*, 821 A.2d at 232 (holding that the Family Court erred by failing to adjudge a party in contempt because "at no time" did he ever attempt to comply with the court's order); *Durfee*, 636 A.2d at 705 (trial justice did not abuse his discretion in finding a party in contempt because although party had taken substantial steps toward reducing the problem as enforcement pressures increased, they had not done so early enough and it was a case of "too little, too late"). Our review of the record reflects that DCYF cultivated efforts to place N.B. in an appropriate level of care, but no such placement was available.[17]

---

[17] In other contexts, we have held that the DCYF is not required to "demonstrate that it took extraordinary efforts but rather it must employ reasonable efforts, and the reasonableness of such efforts must be determined from the particular facts and circumstances of each case." *In re R.M.*, 296 A.3d 682, 690 (R.I. 2023) (internal quotation marks omitted); *see also In re Jae'La G.*, 276 A.3d 378, 391 (R.I. 2022); *In re Rosalie H.*, 889 A.2d 199, 208 (R.I. 2006). For example, we vacated a hearing justice's decision to deny DCYF's petition to terminate a mother and father's parental rights to a child because there was clear and convincing evidence that the department made reasonable efforts to reunify parents and child, i.e., DCYF attempted to formulate case plans, and parents refused to participate or cooperate in those efforts, DCYF offered services to address parents' drug and alcohol usage, and

DCYF argues that compliance with the placement order was not possible because the department could not compel St. Mary's to accept the minor and thus it could not purge itself of the contempt. It is well settled that "[t]he hallmark of civil contempt is the ability to purge the contempt at will" by compliance with the court's orders. *Durfee*, 636 A.2d at 704 (brackets omitted) (quoting *In re Carrie T.*, 516 A.2d 883, 885 (R.I. 1986)). It is clear to us that it was substantially impossible for DCYF to comply with the court's placement order. Unlike in *Gardiner*, where the party "at no time" made an attempt to comply with the court's order, here, the department acted swiftly to locate an appropriate placement for N.B., and had begun the process long before it was court-ordered. *See Gardiner*, 821 A.2d at 232. Even after the hearing justice ordered that N.B. be placed at St. Mary's, DCYF continued its efforts, despite refusal after refusal.

We have held that, when a party exercises the utmost diligence to comply with a court order, but "is literally unable to comply because compliance is not presently within [its] power," it cannot be found in contempt. *Zannini v. Downing Corporation*, 701 A.2d 1016, 1018 (R.I. 1997). Notwithstanding its continued efforts, DCYF could not comply due to circumstances outside the department's control i.e., each facility's refusal to accept N.B.'s referral. *See id.* at 1018 (holding

---

DCYF provided visitation with child. *See In re Nolan V-S.*, 275 A.3d 1146, 1152-55 (R.I. 2022).

it was not an abuse of discretion to hold party in contempt because the party violated the court's order and did not meet its burden in proving impossibility). The record is replete with evidence of DCYF's efforts to place N.B. at St. Mary's or another appropriate facility. No such placement was available, either in-state or out-of-state.[18] Thus, compliance with the placement order was outside the department's control. Accordingly, we conclude that the record before us does not support a finding that DCYF failed to use reasonable efforts to place N.B. at St. Mary's; therefore, such a finding was an abuse of discretion. Consequently, the order of contempt is vacated, and we need not address the remaining issues.

Although we deem it appropriate to vacate the Family Court's order, we share in the hearing justice's frustration. In light of the importance of the matter and ongoing harm the minor was suffering due to her placement at Hasbro, it is clear that the hearing justice deemed swift action by the Family Court to be necessary. The

_____

[18] At oral argument, the OCA asserted that the department's failure to fund or create a placement facility for adolescent girls within the state is at the center of this dispute. The OCA further argues that this systemic failure is the fault of the department, and that they cannot argue impossibility in good faith. In this case, however, the matter before the Court is not whether DCYF violated its statutory obligations to provide necessary care for children. Thus, OCA's reliance on *Fortin v. Commissioner of Massachusetts Department of Public Welfare*, 692 F.2d 790 (1st Cir. 1982), is misplaced. The issue before us concerns whether DCYF utilized reasonable efforts to place this particular child at St. Mary's, and not whether a class of aggrieved individuals had a statutory right to public benefits. *See id.* at 792-93, 797 (affirming order finding Massachusetts Department of Public Welfare not in substantial compliance with consent decree enjoining delays in welfare eligibility determinations).

situation was dire. Despite court orders, the child was receiving no mental-health counseling, schooling, or tutoring of any kind, and she had almost no contact with anyone other than her mother and hospital staff for months. N.B. was only allowed to watch television and paint, all within the confines of her hospital room. While all parties involved were focused on getting the child removed from the hospital and into an appropriate placement, no one, not DCYF, CASA, nor OCA, was focused on providing, at a minimum, either the mental-health counseling or tutoring services N.B. needed. This is a complete failure on the part of all of the agencies charged with providing for this child's care.

## Conclusion

For the foregoing reasons, we vacate the Family Court's order of contempt, and the papers are remanded to the Family Court for further proceedings consistent with this opinion.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re N.B. |
| **Case Number** | No. 2022-75-Appeal.<br>(PJ 21-2526) |
| **Date Opinion Filed** | April 15, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Felix E. Gill |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Lauren E. Jones<br>Department of Children, Youth and Families |
| | For Respondent:<br><br>Andrew J. Johnson<br>Court Appointed Special Advocate<br><br>Diana C. Robbins<br>Office of the Child Advocate |